1  ALEX G. TSE (CABN 152348)
   United States Attorney
2
   BARBARA J. VALLIERE (DCBN 439353)
3  Chief, Criminal Division

4  BENJAMIN KINGSLEY (CABN 314192)
   Assistant United States Attorney
5
        450 Golden Gate Avenue, Box 36055
6       San Francisco, California 94102-3495
        Telephone: (415) 436-6937
7       Fax: (415) 436-7234
        Benjamin.Kingsley@usdoj.gov
8
   Attorneys for the United States of America
9
                    UNITED STATES DISTRICT COURT
10
                  NORTHERN DISTRICT OF CALIFORNIA
11
                       SAN FRANCISCO DIVISION
12

13  UNITED STATES OF AMERICA,            )  CASE NO. CR 15-518 MMC
                                         )
14          Plaintiff,                   )  **UNITED STATES'**
                                         )  **SENTENCING MEMORANDUM**
15      v.                               )
                                         )  Sentencing Date:  August 22, 2018
16  ROBERT JACOBSEN,                     )  Sentencing Time:  2:15 p.m.
                                         )
17          Defendant.                   )
    _____)
18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

DISCUSSION .........................................................................................................................1

    A.    Offense Conduct ...............................................................................................1

        1.    Scheme to Defraud......................................................................1

        2.    Money Laundering......................................................................3

        3.    Flight ..........................................................................................3

        4.    Defendant's Prior Real Estate Litigation ..................................4

    B.    Unresolved Objections to the PSR ...................................................................4

        1.    Objection 1:  Existence of ABC..................................................4

        2.    Objection 2: Control of Attorneys ............................................5

        3.    Objection 3:  Loss Calculation..................................................6

        4.    Objection 4:  Acceptance of Responsibility...............................9

    C.    Guideline Calculations...................................................................................11

    D.    A Sentence of 87 Months Is Sufficient but Not Greater than Necessary to Comply with 18 U.S.C. § 3553(a) ................................................................12

        1.    Nature and Circumstances of the Offense .............................12

        2.    History and Characteristics of Defendant ..............................14

    E.    Financial Penalties ........................................................................................15

        1.    Forfeiture..................................................................................15

        2.    Restitution ................................................................................15

CONCLUSION.....................................................................................................................15

# TABLE OF AUTHORITIES

## Cases

*United States v. Morris*, 744 F.3d 1373 (9th Cir. 2014) ............................................................... 6

*United States v. Ramos-Medina*, 706 F.3d 932 (9th Cir. 2013) ................................................... 10

*United States v. Collins*, 796 F.3d 829 (7th Cir. 2015) ................................................................ 10

*United States v. Hirsch*, 239 F. 3d 221 (2nd Cir. 2001) .............................................................. 10

## Statutes

18 U.S.C. § 3553(a) .............................................................................................................. 12, 15

## Rules

U.S.S.G. § 2B1.1 ..................................................................................................................... 6, 11

U.S.S.G. § 3E1.1 ...................................................................................................................... 1, 9

U.S.S.G. § 2S1.1 ......................................................................................................................... 12

**INTRODUCTION**

On July 19, 2017, defendant pleaded guilty to Counts Seven and Twenty-One of the Indictment, charging him with wire fraud and money laundering, respectively. PSR ¶¶ 1–2; Dkt. 138 (transcript of plea colloquy). That same day, the parties entered into a plea agreement pursuant to Rule 11(c)(1)(B). Dkt. 136. In the plea agreement, the parties agreed to a Sentencing Guidelines Offense Level of between 6 and 26. Dkt. 136 at ¶ 7. This agreement was contingent on, among other things, defendant not violating the terms of the plea agreement, *id.* at ¶ 16, and on defendant "meetin[ing] the requirements of U.S.S.G. § 3E1.1" and "continu[ing] to manifest an acceptance of responsibility through and including the time of sentencing," *id.* at ¶ 7. Defendant has since violated the terms of the plea agreement and affirmatively failed to manifest an acceptance of responsibility. The parties reached no agreement regarding defendant's criminal history.

U.S. Probation has recommended that defendant is an Offense Level of 28 and is in Criminal History Category I, resulting in a Guidelines range of 78 to 97 months of imprisonment. Probation recommends a low-end Guidelines sentence of 78 months of imprisonment, followed by three years of supervised release, $593,981.96 in restitution, and no fine.

The government agrees with Probation's calculation of the defendant's criminal history and Guidelines Range. The government recommends a mid-range sentence of 87 months of imprisonment, followed by three years of supervised release, restitution, forfeiture, and no fine.

**DISCUSSION**

**A.    Offense Conduct**

**1.    Scheme to Defraud**

Defendant was charged with, and pleaded guilty to, a sophisticated real estate fraud and money laundering scheme. In sum, in 2012 and 2013, defendant executed a scheme to create the appearance that mortgage liens on three Bay Area homes had been eliminated via fraudulent lawsuits (including one filed in this district). He then sold or attempted to sell the homes, keeping the majority of the profits for himself. Defendant laundered the money through a variety of entities (including an offshore account) and bought a $475,000 yacht with the funds.

This Court is familiar with defendant's offense conduct, but it is briefly summarized as follows.

First, defendant identified homes that had mortgage liens that secured loans originated by an entity known as "American Brokers Conduit" ("ABC") which was a "d/b/a" for a New York mortgage originator known as "American Home Mortgage Corporation" that went bankrupt during the financial crisis. PSR ¶ 6. As part of the scheme in this case, defendant identified at least three such homes that were underwater on their loans—one in Monterey, one in Danville, and one in San Francisco. PSR ¶ 8. In each case, ABC had originated the loan on the home, secured by a mortgage lien, and then sold the loan to another entity or investor. *Ibid.*

Second, defendant approached owners and told them that he had a way to eliminate the mortgages on their homes by filing a lawsuit. PSR ¶ 9. In exchange for signing the deeds of their homes over to him, defendant told the homeowners (or, in one instance, a real estate agent acting on behalf of the homeowner) that he would file such a lawsuit, that they could stay in their homes until he sold the home, and that when he did sell the home, he would pay them a small share of the proceeds. *Ibid.* At defendant's direction, the homeowners signed the deeds of their homes over into entities defendant controlled—in two cases ("CB Equities" and "Bay Ridge Properties") to entities he controlled through nominees, and in a third case ("EquitecWest") to an entity that he controlled directly. *Ibid.*

Third, defendant controlled a company in New York called "American Brokers Conduit Corporation" ("ABC Corp."). PSR ¶ 7. This entity was not the real mortgage originator, ABC. In each case, defendant filed a collusive lawsuit against this fake ABC Corp.—on behalf of each of the three entities he controlled that owned the homes—claiming, in each case, that the loans that were secured by the mortgage liens were never actually made by the beneficiary of the lien. PSR ¶ 9.

One lawsuit was filed in this district. PSR ¶ 12. One was filed in San Francisco Superior Court. PSR ¶ 23. The third was filed in Monterey Superior Court. PSR ¶ 17. Each lawsuit ended with a stipulated judgment purporting to invalidate the mortgage lien on the home. PSR ¶¶ 12, 17, 23. In each case, no notice was given either to the real ABC (which was part of a bankruptcy trust) or to the entities that actually serviced or owned the loans on the homes.

Fourth, defendant, either himself or through a nominee, recorded the judgments in the respective recorder's offices for each property and then attempted to sell each home. He successfully sold the San Francisco and Danville homes, for $1.2 million and $540,000, respectively, with title companies

clearing title on the homes based on the fraudulent judgments, and unsuspecting individuals buying homes with existing, valid mortgage liens on them. PSR ¶¶ 13, 26. The Danville home was then resold to unsuspecting buyers, based on defendant's same fraudulent judgment, for $800,000. PSR ¶ 15. According to an email sent by defendant, he had a buyer willing to buy the Monterey house for $3 million, but he could not clear title. PSR ¶ 18.

### 2. Money Laundering

After defendant paid off certain (knowing or unknowing) participants in his scheme—the nominees and the original homeowners—he pocketed the remaining proceeds from the sales of each of the two homes. *See* PSR ¶¶ 13, 26 (describing payment of funds after the sale). Defendant received $463,000 personally from the sale of the Danville home, in a shell company he had created, called Altec Properties. PSR ¶ 13. Defendant received $946,000 personally from the sale of the San Francisco home, which he had wired to his bank account in the name of another shell company, Equitec Corporation, at Belize Bank International, in Belize. PSR ¶ 26.

After defendant obtained his fraud proceeds, he laundered them in a series of complex transactions that could only have been designed to try to hide the source of his funds. *See* PSR ¶ 27. He eventually moved all of the funds transferred to Belize back to the United States—demonstrating his overseas account was solely an intermediary account designed to launder what he knew to be dirty money. *Ibid.* He then used $475,038 in fraud proceeds, across two transfers, to pay for the 54' Hylas yacht seized by the government in North Carolina. PSR ¶ 28. Count Twenty-One, to which defendant has pleaded guilty, involved funds transferred for the purchase of the yacht, and defendant has agreed to forfeit his interest in the yacht as part of his plea agreement.

### 3. Flight

In November 2015, defendant was already on his way to the East Coast for a yacht trip to the Caribbean when he was indicted. PSR ¶ 29. At that point, he already knew about the existence of the government's investigation of him, and was informed by the case agent that he had been indicted. *Ibid.* As detailed in the PSR and previously explained to this Court, he ran and then drove away from agents at a marina in Beaufort, North Carolina, before turning himself in approximately a month later. PSR ¶ 30.

### 4. Defendant's Prior Real Estate Litigation

Defendant's patently fraudulent conduct in this case was no accident, and is part of a history of attempts to get something for nothing out of real property. Defendant had previously filed a variety of forms of mortgage litigation, in attempts to "separate" or remove legitimate mortgage liens from real property by suing (generally, incorrectly) mortgage lenders or originators. PSR ¶ 57. The lawsuits did not work.[1] In *Matheson and Virgin Properties, LLC, v. American Brokers Conduit*, C12-01584 (Contra Costa Sup. Ct. 2012), defendant, in July 2012, caused a lawsuit to be filed against the real ABC in an attempt to invalidate a mortgage lien originated on property owned by someone else. The complaint in that case is attached as Exhibit 1. After several docket entries indicating that service on the real ABC named in the lawsuit was "questionable," an attorney for ABC found out about the case and appeared. ABC's role in the case was stayed as a result of bankruptcy, and the case was dismissed. *See* Docket Sheet, *Matheson et al. v. ABC*, *available at* http://icms.cc-courts.org/tellme/tellme/tellmecasereport.asp?language=ENGLISH&courtcode=A&casenumber=MSC12-01584&casetype=CIV.

It was only after defendant's attempts to pseudo-legitimately test his legal theories failed, he orchestrated the fraud scheme for which he is being sentenced now.

### B. Unresolved Objections to the PSR

Defendant has raised four unresolved objections to the PSR. All should be overruled.

### 1. Objection 1: Existence of ABC

Defendant continues to contend that the real ABC "does not legally exist" and objects to language in PSR ¶¶ 6 and 9 to the contrary.

---

[1] Defendant has, at times (for example, in his motions to withdraw his plea agreement), relied on a default judgment in a *Virgin Properties LLC v. Direct Funding*, MSC12-01520 (Contra Costa Sup. Ct. 2012), as a basis for his belief that his theories were valid. *See* Docket Sheet, *Virgin Properties v. Direct Funding*, *available at* http://icms.cc-courts.org/tellme/tellme/tellmecasereport.asp?language=ENGLISH&courtcode=A&casenumber=MSC12-01520&casetype=CIV. To the extent this default judgment was procured absent fraud—such as by intentionally suing or serving the wrong entity, and not suing or serving the real-party-in-interest to the lien at issue—it obviously was ineffective, and defendant's turn to the present scheme is proof that he understood that.

The facts detailed in PSR ¶¶ 6 and 9 discussing the history of ABC, as a "d/b/a" of a massive, failed mortgage originator incorporated in New York, AHMC, are accurate. Exhibits 2 and 3 to the sentencing memorandum are documents from the New York State Department of Banking and the California Department of Corporations, respectively, which list "American Brokers Conduit" as a d/b/a of ABC. Exhibit 4 is the "Declaration of Steven D. Sass," which was prepared for civil litigation arising out of defendant's fraud on the San Francisco Home, plainly explains that AHMC was licensed to do business in California under the d/b/a of American Brokers Conduit. The government was prepared to call Sass at trial so that he could testify to this fact, and the fact that AHMC actually originated all three mortgage loans in question. As this Court noted in its order denying defendant's motions to dismiss the indictment and withdraw his plea, "to the extent defendant points out that the New York Secretary of State has no record of AHMC's having registered ABC as a fictitious business name, defendant's reliance thereon is misplaced, as such registration is only required when a corporation uses the fictitious name when conducting business in the State of New York, *see* N.Y. Gen. Bus. § 130." Dkt. 160.

Whether AHMC was actually licensed to do business in California as "ABC" is not particularly relevant to defendant's sentencing. However, defendant's state of mind with respect to AHMC and ABC is relevant, and the uncontested evidence from his plea agreement and PSR overwhelmingly establishes that this fraud was not the result of some mistaken view of the law. Whatever the actual legal status of ABC, defendant intentionally sued a fake company, hid the lawsuits from the real parties-in-interest on the loan, orchestrated fraudulent judgments on courts, sold the homes as quickly as he could, and hid the fraud proceeds overseas. As explained above, defendant had tried and failed to litigate against real mortgage holders and originators before developing his fraudulent scheme. The various levels of falsehoods, shell companies, nominees, fake identities, money laundering, and concealment plainly demonstrate that he knew that what he was doing was a fraud from the beginning. He knew that he was not going to win in the courts if he sued the right entity (the actual lienholder banks) or even the real ABC, so he orchestrated his entire scheme to get around that problem.

## 2. Objection 2: Control of Attorneys

Defendant objects to various paragraphs, claiming that it is inaccurate that "defendant totally controlled the attorneys who had no idea what was happening." It is unclear to which attorneys

defendant is referring in this objection. First, with respect to the attorneys who litigated the fraudulent lawsuits under defendant's direction—Alla Barbalat, Linda Hope Clarke, and Nikhil Bhatnagar—defendant has already admitted to controlling them. In his plea agreement, defendant agreed that he "caused an attorney to file lawsuits—one for each home—against ABC Corp." and that he "controlled both the plaintiffs and defendants, and their attorneys, in each of the lawsuits, and directed them, in each case, to agree to stipulation judgments that purported to invalidate the liens." Dkt. 136 at ¶ 2. With respect to what each of these attorneys knew, it is not really a mitigating factor for defendant if they were in on the fraud with him (instead, it could give rise to a role enhancement for his supervising others who participated in the fraud). However, in the government's view, these three attorneys clearly did not understand the scheme until after the government approached them as part of its investigation in this case. Each of these three attorneys were either inexperienced or desperate, and though Attorney Hope Clarke passed away before trial was scheduled, Attorneys Barbalat and Bhatnagar were both prepared to testify that they had no idea that defendant controlled both sides of the fraudulent lawsuits.

Second, to the extent defendant is arguing that Michael Yesk and Rod Ciferri had some knowledge about what was happening, those facts are irrelevant. The PSR does not say or suggest that either Yesk or Ciferri were controlled by defendant, or were unaware of the scheme.

### 3. Objection 3: Loss Calculation

Defendant challenges the loss calculation of $5,047,662.47 and the resulting +18 level enhancement. Defendant contends, looking to mortgage fraud cases, that the loss should be offset by the fair market value of the homes. This argument fails, and even if the Court considered the current value of the homes and any possible offset, the sentencing calculation would remain the same. Both situations are discussed below.[2]

First, this is not a mortgage or loan fraud case as contemplated by U.S.S.G. § 2B1.1(b) cmt. n.3(E)(ii)–(iii) or *United States v. Morris*, 744 F.3d 1373 (9th Cir. 2014). In a mortgage fraud case, the defendant obtains a loan via misrepresentation and pledges, at the time of the fraud, valuable collateral

---

[2] Defendant's objection appears mainly to be a legal objection and not a factual objection. Though the government believes that the undisputed facts contained in the PSR are sufficient to establish the loss amount for the Guidelines, the government can offer additional evidence if necessary.

to the lender. The loan in such a case is thus immediately offset by the value of the collateral property interest returned before the fraud is discovered, as the lender has an undisputed interest in that collateral, and the lender will inevitably be able to use the collateral to offset the loss from the loan.

In that sense, the specific rule in mortgage fraud cases is only a particular example of the general rule, at comment note 3(E)(i), to deduct from loss "money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." This rule is inapplicable to this case. Defendant returned nothing to anyone as part of his scheme. He offered no collateral. Instead, he sold valueless, underwater homes to people that never would have bought them had they known that, in reality, the homes were underwater and encumbered by valid liens. He also never returned anything of value to the owners of the San Francisco or Danville homes—instead, he gave them each an underwater home with a loan already in default, and for which it was legally unclear whether they would have any interest—and years of civil litigation.

From that perspective, the loss is simple—it is the amount of money that victim buyers paid or defendant intended that they pay as a result of the fraud. The victims paid $1.2 million for the San Francisco home. PSR ¶ 25. They paid ultimately $800,000 for the Danville home. PSR ¶ 15. And defendant, in his own words, said that he had an offer from someone to buy the Monterey home for $3 million, before the lienholder uncovered the fraud and prevented him from closing any sale. PSR ¶ 18. The total actual loss of his scheme is $2 million and the intended loss is $3 million, for a total loss of $5 million, and a +18 enhancement under the Guidelines.

The appreciation of the homes, long after defendant's completion of his fraud and long after defendant had no further relationship with any parties involved in the San Francisco or Danville parts of his scheme, is irrelevant under the Guidelines. Were it not for defendant's scheme, that appreciation would have inured, in its entirety, to the benefit of the buyers of the homes. The defendant should not get the benefit of that increased value at sentencing now, years after his scheme was completed.

Second, even assuming for purposes of argument that the loss amount should look to today's final, out-of-pocket losses of the parties minus any value they may receive from the homes, the loss amount still results in the same +18 enhancement.

In the case of the Danville property, this analysis is not complicated. As detailed in its victim impact statement, Old Republic Title Company ("ORTC") paid $750,000 to settle the lawsuit with Deutsche Bank over the Danville home. 11/9/2017 VIS of ORTC. This amount reflects ultimate, actual out-of-pocket losses in connection with that home, and a determination by the parties involved in that case, in full consideration of the outstanding amount of the loan, what the house was worth, and what the risks of litigation to each side were.

With respect to the San Francisco property, the analysis is more complicated, as the litigation involving that property is still pending and there were multiple lenders, liens, and buyers involved. However, North American Title Company ("NATC") has expended over $1,887,747.10 million in connection with the fraud and litigation on the San Francisco home. 7/20/2018 VIS of NATC. As detailed in the PSR, one of the buyers of the San Francisco home put $180,662.47 in the transaction which has not been compensated. PSR ¶ 24. Therefore, at this time, known, out-of-pocket paid losses as a result of defendant's fraud on the San Francisco home are at least $2,068,409.57.

Defendant can argue that NATC, the buyers, and the lienholder are still in litigation, and it is possible that NATC or the buyers will either recoup some money, depending on the outcome of the litigation and an ultimate sale price of the home. This should not be a factor at sentencing, as it might not happen in this instance, the actual amounts to be recouped are completely hypothetical, and it is equally possible that NATC will be forced to spend more. Moreover, unlike a mortgage fraud case, it is not possible to simply subtract current market values today from the loan values five or six years ago to determine the remaining value in the San Francisco home after the initial mortgage lien is paid off, for at least two reasons: (1) defendant's scheme was complex and the law sufficiently unclear that there is no certainty that the buyers or title companies are legally entitled to that appreciated value, and (2) since the sale of the home, the original loans have been continuing to accrue penalties and interest, and the properties have been accruing property taxes, for years. Any offset to which the buyers or title companies would receive is contingent on the lienholder agreeing that the buyers or title companies are entitled to some of this bonus value, and then requires a determination of what that bonus value, subtracting all of the other costs, actually is.

However, assuming, hypothetically, in a best-case scenario for defendant, the San Francisco home were sold for $3,192,889 million (the current Redfin.com estimate of the value of the property, *see* https://www.redfin.com/CA/San-Francisco/1611-Broderick-St-94115/home/1920642, which does not take into account any possible problems it might have), and assuming 5% in commissions, the proceeds of such a sale would be approximately $3,033,000.  As of January 2017, the lienholder was owed more than $2 million on the loan, and that number has only increased with time, and is likely approximately $2.1 million now.  *See* Exhibit 5 (January 17, 2017 payoff statement for loan on San Francisco home).  Assuming, in this best-case hypothetical scenario, the lienholder settled to allow NATC and/or the prior buyers to recoup the *entire* proceeds of the sale of the home above the loan amount, the total offset recouped would only be approximately $933,000, which, once offset from out-of-pocket losses, would result in a loss of approximately $1,135,409.57 on the San Francisco home.

Finally, defendant fraudulently attempted to sell the Monterey home for $3 million.  By February 2013, the outstanding balance on the loan on the Monterey home was at least $2,800,569.40.  PSR ¶ 17.  Even if, as defendant suggests in his objections, the intended loss amount should only cover the value of the Monterey loan at the time of the intended sale—because defendant's intended buyer would have paid $3 million for a $3 million house with a $2.8 million loan on it—the loss to the intended Monterey buyer is still the value of the outstanding loan as of February 2013, which is $2.8 million.

Thus, even under defendant's own view of the law, and even giving him an optimistic prediction of what might happen with the San Francisco house, the actual and intended losses from his fraud would be, approximately, $750,000 (Danville) + $1,135,409.57 (San Francisco) + $2,800,000 (Monterey) = $4,685,409.57.  That still results in a +18 enhancement for loss amount under the Guidelines.

### 4.    Objection 4:  Acceptance of Responsibility

Defendant contends that he should receive a 2-point reduction to his Guidelines level for acceptance of responsibility.  Defendant should not receive that reduction.

U.S.S.G. § 3E1.1 provides, "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels."  The Ninth Circuit has explained that, in evaluating whether a defendant has met that standard, courts must look to the defendant's "conduct as a

whole," to determine if the defendant has accepted responsibility. *United States v. Ramos-Medina*, 706 F.3d 932, 940 (9th Cir. 2013).

The comment notes to the Guideline state that evidence of acceptance via a guilty plea "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility. A defendant who enters a guilty plea is not entitled to an adjustment under this section as a matter of right." *Id.* cmt. n.3. The comment note applies directly to a defendant, like this one, who has repeatedly attempted to withdraw his guilty plea in a manner completely inconsistent with an acceptance of responsibility. Other circuits have held that moving to withdraw a guilty plea is a basis for withholding credit for acceptance of responsibility. *See, e.g.*, *United States v. Collins*, 796 F.3d 829, 836 (7th Cir. 2015) ("Here, the district court based its decision to withhold an acceptance of responsibility adjustment on Collins' ill-fated attempts to withdraw his plea. Longstanding precedent permits district judges to withhold the adjustment for that reason alone."); *United States v. Hirsch*, 239 F. 3d 221, 226 (2nd Cir. 2001) ("An attempt to withdraw a plea, although not automatically disqualifying a defendant from seeking an adjustment, *see United States v. Negron*, 967 F.2d 68, 73 (2d Cir. 1992), is a well-established ground for denying the adjustment.").

Despite pleading guilty, defendant has filed three motions, pro se, that are inconsistent with his acceptance of responsibility. First, on April 16, 2018, after a lengthy delay, defendant moved to dismiss his indictment and withdraw his guilty plea. Dkt. 158. That motion not only, by its filing, is inconsistent with acceptance of responsibility, but includes a variety of statements by defendant that are false or misleading, obfuscating, inconsistent with facts admitted in his plea agreement, and/or show he has not accepted responsibility for his offense. *See, e.g.*, Dkt. 158 at 3 ("Clarice Batiste of CB Equities was interested in buying the house, suing ABC then reselling the house to make a nice profit and pay the prior owner his $55,000. She hired attorney Nikhil Bhatnagar (Bhatnagar) who was a contract attorney under Yesk."); *id.* at 4 ("The stipulation stated that ABCC had never loaned any money on the Verde Mesa house and didn't object to a removal of the deed of trust from the property. See Exhibit 4 showing stipulation. A truthful statement by ABCC saying they had never loaned money on this deed of trust."); *ibid.* ("ABCC hired an attorney that had ben [sic] considered to work at Yesk Law but wasn't hired, Alla Barbalat."); *ibid.* ("Sometimes the entity that owns a note and deed of trust is very challenging to

identify.  This procedure was to flush out the entity that claimed to own the void deed of trust.  It was expected that entity that claimed to own the void note and deed of trust would file a new suit to reverse the stipulated judgment."); *id.* at 5 ("I was told by the attorneys that their only recourse is to demand their money back from the purchase of the void note and deed of trust.  It's sort of a puzzle who they might have paid to buy this worthless asset.  It couldn't have been ABC because as a non-entity they could not have opened a bank account.  I'm sure there will be more to this story with time."); *ibid.* ("The owner of the house never borrowed any money from anyone on the house, but the house came with a deed of trust that is invalid (void) and should be removed, as it is a cloud on the title.").  He finished his motion with the statement, "I want to have my day in court for a fair trial."  *Id.* at 22.

Second, on May 14, 2018, after this Court denied defendant's initial motion, he moved for reconsideration.  Dkt. 161.  That motion was much shorter, but included the statement that defendant was an "innocent person."  *Id.* at 2.

Third, on June 7, 2018, after this Court denied defendant's motion for reconsideration, defendant filed yet another motion to withdraw his guilty plea.  Dkt. 163.  On the second page, defendant wrote, "Defendant maintains his innocence with respect to the allegations in this case."  *Id.* at 2.  On the sixth page, he wrote that he "maintains his innocence."  *Id.* at 6.

Fourth, on June 15, 2018, defendant sent an unsolicited email to the Probation officer, "noting that if the Court allows him to withdraw his plea, he is optimistic that he will be found not guilty at trial."  PSR ¶ 38.

In sum, defendant has manifested a complete absence of acceptance of responsibility—indeed, he has affirmatively said, repeatedly, that he is not responsible for his crimes.  He is not entitled to the two-point adjustment.

## C.    Guideline Calculations

The government agrees with Probation's calculation of the Guidelines.  The Guidelines are set forth below:

|   |   |   |
|---|---|---|
| a. | Base Offense Level, § 2B1.1(a)(1) | 7 |
| b. | Loss amount, § 2B1.1(b)(1)(J) | +18 |
| c. | Sophisticated means, § 2B1.1(b)(1) | +2 |

| | | |
|---|---|---|
| d. | Conviction for § 1957, § 2S1.1(b)(2)(A) | +1 |
| e. | Adjusted offense level | 28 |

The loss amount and absence of an adjustment for acceptance of responsibility are discussed above. Defendant's highly complicated scheme, relying on his deep understanding of the real estate and mortgage industry, involving multiple shell companies and nominees, and bank accounts in the United States and overseas, demonstrates sophisticated means.

Given that defendant's Adjusted Offense Level is 28, and his Criminal History Category is I, his Guidelines range is 78 to 97 months of imprisonment.

### D. A Sentence of 87 Months Is Sufficient but Not Greater than Necessary to Comply with 18 U.S.C. § 3553(a)

Defendant is a manipulative, repeat fraudster who orchestrated one of the most complex real estate frauds this district has seen. His scheme was methodically planned and developed, and, when executed, resulted in massive gains for defendant and left a trail of economic chaos behind him. He has expressed no remorse or acceptance of responsibility for the significant harm he caused to many people and institutions. These facts, combined with his history of and continued fraud, warrant a mid-range Guidelines sentence of 87 months of imprisonment.

#### 1. Nature and Circumstances of the Offense

Defendant's fraud was unique in its sophistication and its deliberation. As discussed above, this was not a case of mistaken identity. Defendant, with his extensive experience in the real estate industry and litigating against banks and mortgage originators, spotted a weakness in the mortgage and judicial system and then exploited it. There was no moment in his scheme where he exhibited a good faith belief that the mortgage liens were invalid. He moved as quickly as possible to sell the homes because he knew exactly what would happen as soon as the real lienholders figured out what he had done—come back to collect their property, to the detriment of those to whom he sold the houses. Throughout his scheme, defendant took the exact actions one would take if one knew that what he was doing was illegal: amassing a cadre of nominees to hold the entities and properties to limit his own name showing up on bank accounts, legal papers, or corporate documents; pretending, repeatedly, that he was only advising people in the transaction and not the real party behind the transactions; hiding his control of

both sides of the litigation from the lawyers that he caused to be hired; creating a fake identity to correspond with one of the lawyers when his friend in New York backed off after he figured out the sketchiness of the scheme; moving money in and out of various bank accounts, and then to Belize; and attempting to flee at the moment when he was about to be arrested.

To successfully develop such a scheme requires expertise and intelligence, and to execute it requires a serious pathology and willingness to lie to multiple people—including courts—for a long period of time. He lied to the owners of the homes about what he planned to do with their homes, getting them to sign title over to him, not knowing he was drawing them into his fraud. He lied to and manipulated Michael O'Brien and Clarice Batiste, desperate people willing to serve as defendant's nominees for token amounts of his fraud proceeds. He lied to his friend in New York, who he convinced to serve as the "face" of defendant's fake ABCC entity. He found inexperienced lawyers, knowing that he could control them, and then repeatedly lied to those lawyers, too, manipulating them into putting their professional reputation on the line, unknowingly, as part of his sprawling scheme. He lied to the title companies, to get them to clear title, and to homebuyers—the people, ultimately, who were his most direct financial victim, convincing them to part with significant amounts of money, as quickly as possible.

The loss amount discussed above captures the financial impact of defendant's fraud, but not the myriad other ways in which it harmed people. In his victim impact statement, K.H., who with his wife bought the Danville home for their family to live in, expresses it best, writing: "Buying a home is typically a milestone to be celebrated. But due to Robert Jacobsen's fraudulent scheme, our home purchase has turned into a nightmare that has lingered for over three years." V.I.S. of K.H. at 1. As K.H. explains, they were "caught in the crossfire between [their] title insurance company and the bank," constantly in fear over losing the home that they have saved for and purchased. *Id.* at 2. Defendant, who had worked in the real estate industry for years, knew that this was the exact outcome that would befall the ultimate buyers of his homes—just regular people stuck between the institutions fighting over who had to bear the cost of money he had taken.

Throughout all this—and despite being directly aware through this case of the harm he has caused others—defendant continues to deny any responsibility for his actions. He blames the banks, the

investigating agents, the government, the title companies, and his attorneys for the mess that he created and out for which only he truly profited. Instead of trying to make right his crimes, he has tried repeatedly to get out from his plea agreement that he entered into at the 11th hour while staring down a trial for which the government had spent months preparing and at which he was going to be convicted.

The Guidelines account for many of these factors appropriately—the loss amount, the sophistication of the scheme and his money laundering, and his failure to accept responsibility. A mid-range sentence accounts for the uniquely pathological and devious nature of his scheme, and the non-financial harm he intentionally caused to others with his lies.

### 2. History and Characteristics of Defendant

Defendant's history and personal characteristics also support a mid-range Guidelines sentence. Defendant has a history of real estate fraud. In 2007, he filed a bankruptcy petition in bad faith, and attempted to conceal assets and "frustrate his creditors." PSR ¶ 58. In the lead up to this fraud, he caused the filing of multiple lawsuits relating to real estate, the impact of which was, in general, to frustrate creditors' ability to recover collateral on underwater homes. Then, most recently, as detailed in the government's Motion to Revoke Release and Remand to Custody, Dkt. 174, and its supporting documents, defendant has spent the last two weeks attempting to fraudulent rent out the Monterey home at issue in this case under a fake name, in violation of the terms of his pretrial release. Defendant cannot stop lying to people in connection with real estate, and he cannot stop attempting to get something for nothing. He is an economic danger to the community and deserves a lengthy prison sentence to prevent him from continuing to victimize people in connection with real property.

In contrast to the aggravating circumstances of his history of fraud, defendant has no meaningful mitigating circumstances in his personal history. PSR ¶ 62–63, 72–74. He is a classic white-collar criminal, college educated and afforded every advantage in life, who earned, by his own account, approximately $300,000 to $400,000 per year, yet still repeatedly victimized other people.

Given his history, a mid-range Guidelines sentence is appropriate.

//

//

//

**E.     Financial Penalties**

**1.     Forfeiture**

As part of the plea agreement, defendant agreed to forfeit his interest in the yacht that was purchased with the proceeds of the fraud (part of which was Count Twenty-One, to which he pleaded guilty).  The government respectfully requests that the judgment order that forfeiture.

**2.     Restitution**

In his plea agreement, defendant agreed "to pay full restitution for all losses caused by all the scheme or offenses with which I was charged in this case" and agreed "to pay restitution in an amount, if any, to be set by the Court at the time of sentencing."  Dkt. 136 at ¶ 9.  Restitution is mandatory in this case under 18 U.S.C. § 3663A.  As discussed above, two victims have identified financial losses in their victim impact statements, and the buyers of the San Francisco home have additionally suffered financial losses as part of defendant's fraud.  The government respectfully requests that the Court issue a restitution order accounting for these losses.

**CONCLUSION**

With full consideration of all the sentencing factors set forth in 18 U.S.C. § 3553(a), the United States respectfully requests that the Court impose a mid-range Guidelines sentence of 87 months of imprisonment, three years of supervised release, restitution, forfeiture, and a $100 special assessment per count.

Dated:  August 15, 2018

Respectfully submitted,

ALEX G. TSE
United States Attorney

_____/s/_____
BENJAMIN KINGSLEY
Assistant United States Attorney